## Chesapeake Stone Company v. Holbrook.

(Decided January 27, 1916.)

Appeal from Carter Circuit Court.

1. Explosives—Liability of Person Using.—Where the owner of a rock quarry had several holes drilled in which sticks of dynamite were placed to be exploded, and after it was supposed all of the charges had been exploded, other laborers were set to work in this place, and one of them struck with his pick a stick of dynamite placed in one of these holes but that had not been fired off, thereby exploding it, the owner of the quarry was liable in damages to a person injured by the explosion, although it made a casual inspection of the premises after the charges put in the holes had been fired off and did not know of the presence in the holes of the unexploded dynamite.

2. Explosives—Degree of Care Required by Person Using—Instruction.—When dynamite in the course of work is put in holes for the purpose of being and is attempted to be exploded, the master must make a very careful examination for the purpose of ascertaining whether all the charges have exploded before he sends other men to work at this place, with implements that might cause an explosion by coming in contact with any charge that had not exploded. The inspection must be sufficient to meet the highest degree of care practicable under the circumstances, for the purpose of discovering whether any of the dynamite had been left unexploded, and the jury should be so instructed.

3. Corporations—Dummy Corporations—Evidence to Show Existence of.—The stockholders of a solvent corporation will not be allowed to incorporate a dummy corporation for the sole purpose of trying to protect the solvent corporation from suits and damages in the operation of the work in which it is engaged, and any person who has a cause of action against the corporations conducting their business in this way may sue both of them and recover against the solvent corporation, although his contract was made with the dummy and it was apparently in control of the work out of which the cause of action arose; and the fact that one of the corporations is a dummy may be shown by circumstances.

H. L. WOODS and JOHN M. THEOBALD for appellant.

JAMES CLAY and E. HOGGE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Chesapeake Stone Company, was engaged in operating a stone quarry, and in the conduct of its work it used charges of dynamite, fired by caps and fuse. The appellee, Holbrook, while engaged at work as a day laborer for the company in its quarry, was permanently and seriously injured by the explosion of a stick of dynamite left in a rock at the place where he was working by other servants of the company who had charge of the blasting in its quarry.

It appears that a few days before appellee received the injuries complained of, eight or nine holes about eighteen inches deep and confined to a small space, were drilled for the purpose of putting in them the dynamite, and that after these holes were drilled, McCoy, an employe of the company, loaded them with sticks of dynamite, prepared with caps and fuse, for the purpose of blasting; that McCoy attempted to set off all these charges of dynamite at one time and doubtless thought he had done so, but the dynamite in one of the holes did not explode. Some days after this the appellee was

working in company with a co-laborer named Henderson in the rock where the dynamite had been placed, and Henderson, who was using a pick in the course of his work, happened to strike with the pick the unexploded charge of dynamite, causing it to explode, with the result that Henderson was immediately killed and the appellee seriously and permanently injured.

In this suit to recover damages for the injuries so sustained, the appellee had a judgment for a moderate sum, and the stone company appeals.

Counsel for the company devote some part of their argument to an effort to show that appellee was not working at the place he was assigned to work, and that Henderson was not doing the things that he had been directed to do. But we do not find any merit in either of these contentions. Appellee was employed as a common laborer. He was not directed to work in any spot in the quarry, nor was he warned or forbidden to go to or about the place where he was when the explosion occurred. Under these circumstances, and being ignorant of the presence of the dynamite, he had a right to assume that it would be safe for him to go in and about the quarry at any place near the place at which he was assigned to work. It may also be said that Henderson when he struck this charge of dynamite was performing service in the course of his employment, and of course did not suspect that unexploded dynamite was in the rock at the place he was working.

It is further suggested by counsel that this dynamite which exploded may have been put there by some person other than McCoy or by some person not connected with the company; but this suggestion is entirely unsupported by any fact or circumstance shown in the record. In fact, we think there can be no reasonable doubt that the dynamite that exploded had been placed in one of the holes by McCoy, but for some unexplained reason did not explode when he attempted to fire off these several charges. It may be true that McCoy thought all the dynamite had been exploded, and it may also be true that the dynamite that did explode covered the premises with rock and dirt to such an extent that it could not be told by an ordinary inspection that one charge had not been exploded, but these circumstances do not excuse the company from liability.

It does not appear that any careful inspection of the premises after the explosion by McCoy was made for the purpose of ascertaining whether it had all exploded. There was only what may be called a casual inspection or examination. McCoy says that he believed all the charges had exploded and that the debris prevented him from telling with certainty whether they had or not, but he did not make, nor did any one else, any careful inspection for the purpose of determining whether all of the charges had exploded. In work like this the stone company was under a duty to exercise ordinary care to furnish appellee a reasonably safe place in which to work, and considering the dangerous nature of dynamite and the fact that the company knew it had been put a few days before at the place where Henderson and appellee were working, this duty imposed upon it the further duty of making a very careful examination after the explosion by McCoy to ascertain whether or not all of the charges of dynamite had exploded. And this duty it did not perform, nor did it warn Henderson or appellee of the probable presence of the dynamite.

Dynamite is an inherently dangerous agency, and persons who use it must exercise care corresponding with the danger. When dynamite in the course of work is put in holes for the purpose of being exploded, and is attempted to be exploded, the master must make a very careful examination for the purpose of ascertaining whether all the charges have exploded before he sends other men to work at this place with implements that might cause an explosion by coming in contact with any charge that had not exploded. What kind of an inspection he should make, or what efforts he should resort to, or what methods he should use for the purpose of definitely ascertaining whether the dynamite has been exploded or not, are questions that must be settled according to the nature and circumstances of the surrounding conditions. But whatever effort or whatever method or whatever inspection is resorted to, it must be sufficient to meet the high degree of care exacted; and this degree of care is the highest degree of care practicable under the surrounding conditions.

We had before us in Harp v. Cumberland Telephone & Telegraph Co., 25 Ky. L. R., 2133, a case something like this. In that case Harp was employed by the telephone company in the work of digging post holes, and

when he went to work to complete the digging of a hole that had been partially made the day before by other servants of the company, some dynamite that had been left in the hole by other servants exploded, causing the injuries of which he complained. In discussing the duty and liability of the telephone company the court said:

"As has been repeatedly held by this court, it is the duty of the employer to supply the servant with reasonably safe and suitable tools and machinery to perform the work required of him, and equally his duty to furnish him a reasonably safe place in which to work, and to see that it is kept so. * * * The appellant had the right to assume that the foregoing rule would be observed by the foreman and other servants of appellee on the occasion of receiving his injuries, and it was their duty to know that there was dynamite in the hole in which he was ordered to dig, and to remove it, or warn him of its presence in time to have prevented his injuries. It is manifest from the evidence that some of the appellee's servants then present did know that there was dynamite in the hole, for they had a few days previously left it there, and further manifest that appellant did not know it was there. It could not be seen, because covered by both mud and water. It matters not that it was left in the hole by a fellow servant of appellant, as the negligence of such servant was and is imputable in such a case to the appellee as master."

In C., N. O. & T. P. Ry. Co. v. Padgett, 158 Ky., 301, Padgett was injured by the explosion of a stick of dynamite that had been placed in a bucket of pitch. In stating the duty of persons using the dynamite, the court said: "It is the duty of persons who keep in their possession or employ in their business, that which unless carefully guarded and cautiously used is dangerous to others, to exercise such care to see that the dangerous agency is so kept and used as not to inflict injury upon others as an ordinarily prudent person would be expected to exercise in the use and keeping of such dangerous agency."

In Jobe v. Spokane Gas & Fuel Co., 73 Wash., 1, 48 L. R. A. (N. S.), 931, the court, in setting out the duty and liability the master is under to protect his servant from injury caused by the presence of powder that had not exploded, said: "In the employment of inherently dangerous agencies, such as powder or other explosives,

it is the duty of the master to exercise a degree of care for the safety of the servant commensurate with the danger reasonably to be anticipated."

In Blaisdell v. Davis Paper Co., 75 N. H., 497, 139 A. S. R., 735, in discussing the duty of the master in a case like this, the court said:

"In view of the extreme hazard which would be created by the presence of such an explosive in the ground which a gang of men were removing with pick and shovel, it cannot be said as a matter of law that it was not the master's duty to use every precaution human ingenuity could suggest or else warn the workmen of the danger."

And in Mather v. Rillston, 156 U. S., 391, 39 L. Ed., 464, the Supreme Court used this strong language: "Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger, there must be used all appliances readily attainable known to science for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence. If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred and this fact should not be lost sight of. So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of labor thereon, and such laborers remain in ignorance of the dangers and suffer in consequence, the employers will also be chargeable for the injuries sustained."

In the case we have the court told the jury, in substance, that it was the duty of the defendant to furnish the plaintiff a reasonably safe place in which to work and to see that it was kept so, and that if the defendant knew, or by the exercise of ordinary care could have known, of the presence of the dynamite at the place at which he was directed to work, it was its duty to remove the same or warn him of its presence in time to have prevented the injury.

This instruction is complained of, but we think it was too favorable to the company. It did not impose on it the high degree of care required to be exercised under the circumstances. The jury should have been

told that it was the duty of the company to exercise the highest degree of care practicable under the existing conditions for the purpose of discovering whether any of the dynamite had been left unexploded, and if it knew, or by the exercise of this degree of care could have known, of the presence of the dynamite, it was its duty to remove the cause of the danger or warn appellee of the danger.

This suit was brought against the Chesapeake Stone Company and the Highland Stone Company. The petition charged that the Highland Stone Company was a corporation created under the forms of law for the sole purpose of aiding and assisting the Chesapeake Stone Company to escape liability for injuries that might happen to its servants working in the quarry; that the Highland Stone Company was an insolvent, irresponsible concern, while the Chesapeake Stone Company, the real owner and operator of the business, was solvent and responsible, but was using the name of the Highland Stone Company as the operator of the quarry in a fraudulent effort to protect itself from suits growing out of the operation of the quarry by it, and judgment was sought against each of the companies.

It is right hard to tell from the evidence which of these companies was the real owner and operator of the quarry. Both of them appear to have been owned by the same people and both of them figure in more or less degree in the operations of the quarry. There was evidence that appellee and other employes were paid by checks of the Highland Stone Company, and there was also evidence that the foreman who employed appellee employed him to work for the Highland Company. It was further shown that the name of the Chesapeake Stone Company was printed or marked on the crusher used by the company. And the evidence of one W. B. Whitt throws a good deal of light on the connection of these companies in the operation of the quarry, which connection it was apparently the purpose of the officers to conceal.

Whitt testified that at one time he was the owner of practically all of the stock of the Chesapeake Stone Company, which then owned and operated the quarry, and that for the purpose of protecting it and the stockholders from suits and liability, he organized the Highland Stone Company with a capital stock of five hundred

dollars. That it was organized solely for this purpose, and that pursuant to it, it leased the quarry from the Chesapeake Stone Company at a rental so high that it would be impossible for the Highland Stone Company to ever make any profit. That after operating the quarry this way for a few years, he sold both companies to Ireland & Francis, who owned them at the time appellee was injured, telling them at the time of the sale why the Highland Stone Company had been organized and how the business between it and the Chesapeake Stone Company was conducted. This witness also said that about the time appellee was injured he purchased from the Chesapeake Stone Company a lot of crushed stone manufactured at this quarry and paid this company for it, and also purchased from it dynamite for which he paid it.

It is complained that this evidence was not competent, but we think it was. In the absence of any other evidence to the contrary, it is fair to assume that Ireland & Francis were using the Highland Company for the purpose that Whitt had used it, and that the Chesapeake Company was the real owner and operator of the quarry. The appellee sued both of these companies, and not having in his possession the facts or the records showing their relation, he had the right to show by such facts and circumstances as were available to him the business relations between them and which one of them was, in truth, the owner and operator of the quarry.

The officers of these companies of course knew whether the companies were operating the quarry jointly, or, if one of them was operating it, which one. They also knew the relation these companies sustained toward each other, and if only one of them was liable for injuries suffered by employes in the quarry, which one of them it was. But curiously enough not one of the officers of either of these companies was offered as a witness, nor was any evidence introduced in behalf of either of the companies showing their relation to each other or which one of them was, in fact, the owner of or operating the quarry.

Under the circumstances related, we think there was sufficient evidence to authorize the jury to find as they did against the Chesapeake Stone Company alone.

The stockholders of a solvent corporation will not be allowed to incorporate a dummy corporation for the sole purpose of trying to protect the solvent corpora-

tion from suits and damages in the operation of the work in which it is engaged; and when a person has a cause of action arising either in contract or tort against corporations conducting their business in this way, he may sue both of them, and if the evidence is sufficient, recover against the solvent corporation, although his contract was made with the dummy, and it was apparently in control of the work in which the employe was injured. The question as to which one of these companies was the real owner and operator of the quarry was submitted to the jury in an instruction telling them, in substance, that if they believed from the evidence that the Highland Stone Company was not operating the property in good faith, but solely for the purpose of permitting the Chesapeake Stone Company to escape liability for plaintiff's injuries, they should find against the Chesapeake Stone Company alone, but if they believed that the Highland Stone Company was the real owner and operator of the quarry, they should find against it alone. Under this instruction the jury found against the Chesapeake Stone Company alone, and we think the evidence warranted such a finding.

There is some criticism of the instructions, but we think it is not well founded. It is also said that Henderson and the appellee were fellow servants and the jury should have been instructed on this issue. We do not think so. These men were not fellow servants in the sense that the company was not responsible for injuries to one caused by the act of the other. The failure of the company to exercise the degree of care required of it caused not only the death of Henderson but the injury to appellee, and under no view of. the case that we can think of should the company be excused for the injuries inflicted upon appellee.

It is further urged that it was error to permit Clarence Henderson, a witness for appellee, to relate a conversation with Will McCoy shortly after the accident, in which McCoy, as Henderson testified, said, "We knew that dynamite was there. It was in that lot of shots that was put there a week ago." This evidence was not competent, but neither did it prejudice the substantial rights of the appellant. The evidence showed conclusively that the dynamite had been put there by McCoy, and whether he or the company knew it was there or not at the time of the accident, it is very clear that the required degree

of care was not exercised to discover its presence. Not having exercised the requisite care, the situation is virtually the same as if it had known the dynamite was there and failed to warn the employes of its presence.

Upon the whole record, we think the appellant had a fair trial and that the judgment against it was authorized by the law and evidence. Wherefore, the judgment is affirmed.